1          **IN THE UNITED STATES DISTRICT COURT**
           **EASTERN DISTRICT OF NORTH CAROLINA**
2                    **WESTERN DIVISION**

3

4    **UNITED STATES OF AMERICA,**        )
                                          )
5                                         )
                                          ) **Case No.**
6                                         ) **5:14-CR-00120-H-1**
                                          )
7    **TERESA LYN FLETCHER,**             )
                 **Defendant.**           )
8    _____

9
                    **PRETRIAL RELEASE VIOLATION HEARING**
10           **BEFORE SENIOR JUDGE MALCOLM J. HOWARD**
                    **OCTOBER 8, 2014; 2:21 P.M.**
11                  **GREENVILLE, NORTH CAROLINA**
     _____
12
     **FOR THE GOVERNMENT:**
13
     Edward Gray
14   Assistant U.S. Attorney
     310 New Bern Avenue, Suite 800
15   Raleigh, North Carolina  27601-1461

16   **FOR THE DEFENDANT:**

17   William Andrew LeLiever
     5 West Hargett Street
18   Suite 310
     Raleigh, North Carolina  27601

19

20

21

22          Proceedings recorded by mechanical stenography,
     transcript produced by computer.
23   _____

24              **DAVID J. COLLIER, RMR, CRR**
                 FEDERAL OFFICIAL COURT REPORTER
25                     413 MIDDLE STREET
                    NEW BERN, NC  28560

```
 1                    P R O C E E D I N G S
 2                    - - - o0o - - -
 3            THE COURT:  All right.  Calling the case of
 4  United States versus Teresa Lyn Fletcher.
 5            Are you Ms. Fletcher?
 6            THE DEFENDANT:  Yes, sir.  My attorney is in the
 7  restroom.
 8            THE COURT:  Don't they understand the clock, you
 9  reckon?  Marshal will get him.
10            All right.  In the case of United States versus
11  Teresa Lyn Fletcher, Docket Number 5:14-CR-120-1-H, let the
12  record reflect Ms. Fletcher is present with her counsel.  Let
13  me see the revised calender.
14            Counsel, I lost your name.
15            MR. LeLIEVER:  LeLiever, Your Honor, William Andrew
16  LeLiever.
17            THE COURT:  Yes, sir, Mr. LeLiever.  Are you
18  representing Ms. Fletcher in this matter?
19            MR. LeLIEVER:  I am, Your Honor.  I think I've done a
20  general appearance in this matter, filed discovery.  I think I
21  filed all the motions in this case.
22            THE COURT:  Okay.  Were you representing her at the
23  time of her initial appearing and her arraignment?
24            MR. LeLIEVER:  By the time of the arraignment I had
25  already entered a general appearance.  At the initial
```

1    appearance, which was the bond hearing, I actually was present.

2                THE COURT:  I understand.

3                MR. LeLIEVER:  I was not retained at the time, but I

4    did not make an appearance at that time.

5                THE COURT:  That was before Judge Gates in Raleigh.

6                MR. LeLIEVER:  That was, and I also made an

7    appearance in front of Judge Swank here.

8                THE COURT: All right.  I'm with you now.

9                Mr. Gray, this is not your case, it's Hulbig's case,

10   correct?

11               MR. GRAY:  Yes, Your Honor.

12               THE COURT:  All right.  Now, so I have the facts

13   before me, Ms. Fletcher, a true bill of indictment was returned

14   by the grand jury on or about June 18th of this year charging

15   you with three counts -- correction, four counts, one count of

16   bank fraud, Counts 2 and 4, making false statements to a

17   financial institution that's federally insured, and Count 3 was

18   bank fraud aiding and abetting.

19               She has had her initial appearance before

20   Judge Gates, as I just stated, and at that time Judge Gates

21   found conditions meritorious for her release.  Then later, on

22   or about -- when was the arraignment, Madam Clerk?

23               THE CLERK:  I believe it was at the last term,

24   Your Honor.  September the 8th.

25               THE COURT:  September 8th, at the arraignment before

Magistrate Judge Swank, September the 9th, she entered pleas of guilty to Counts 2 -- to two counts of bank fraud and one count of mail fraud.  Supervision was continued.

Now, the conditions were numerous, but they specifically consisted of, before Judge Gates, cannot apply for new credit or open a bank account without the permission of a probation officer, and that same -- those same circumstances were affirmed by Judge Swank.

Now, before me is the petition for action on her pretrial release alleging that she has violated the conditions in that she applied for a $150,000 capital loan from Direct Capital, I assume, Mr. Probation officer, Mr. Campbell, without your permission or authorization.

PROBATION OFFICER:  That's correct, Your Honor.

THE COURT:  All right.  Does she admit or deny that, Mr. LeLiever?

MR. LeLIEVER:  She denies that, Your Honor.

THE COURT:  Say again?

MR. LeLIEVER:  Denies it, Your Honor.

THE COURT:  All right.  Mr. Gray, are you prepared to go forward?

MR. GRAY:  Yes, Your Honor, we are prepared to go forward.

THE COURT:  Call your witness.

MR. GRAY:  Thank you.  At this time I'll be calling

1  Secret Service Agent Mr. Stephen Turner.

2              THE COURT:  Agent Turner, come up to Madam Clerk and

3  be sworn, please, sir.

4              THE CLERK:  Would you place your left hand on the

5  bible and raise your right hand.  Please state your name.

6              THE WITNESS:  Stephen Turner.

7              THE CLERK:  Do you swear that the testimony you're

8  about to offer the Court in this matter will be the truth, the

9  whole truth and nothing but the truth, so help you God?

10             THE DEFENDANT:  I do.

11             THE CLERK:  Would you have a seat in the witness

12  stand, please.

13             THE COURT:  You made proceed, Mr. Gray.

14             MR. GRAY:  Thank you, Your Honor.

15                         - - - - -

16                    DIRECT EXAMINATION

17  BY MR. GRAY:

18  Q    Agent Turner, would you please state your name and spell

19  it for the record, please.

20  A    Absolutely.  My name is Stephen, S-T-E-P-H-E-N, Turner,

21  T-U-R-N-E-R.

22  Q    And who are you employed by?

23  A    By the United States Secret Service.

24  Q    How long have you been working with Secret Service?

25  A    A little over seven years.

1   Q    And what are your primary duties with the Secret Service?

2   A    We investigate financial crimes as it impacts the

3   financial structure for the U.S. Government.  We also do

4   protection for various dignitaries.

5   Q    In this case you were working primarily in the financial

6   crime investigation, correct?

7   A    Correct.

8   Q    So you're familiar with the defendant in this case?

9   A    Yes, I am.

10  Q    Would you please briefly describe to the Court the nature

11  of the investigation that you -- that led to the pleading

12  guilty of the two counts of the indictment.

13          THE COURT:  Three counts.

14          MR. GRAY:  I'm sorry, Your Honor.  I believe she --

15          MR. LeLIEVER:  Your Honor, if I may.  We actually

16  pled to criminal information and that's why it was three counts

17  and the third being mail fraud.  The indictment was four

18  counts, the criminal information was three counts, and I

19  apologize for that, Your Honor.

20          THE COURT:  So noted.  Thank you, Mr. LeLiever.

21          Go ahead, Mr. Gray.

22  A    Sir, the defendant came to the attention of the Secret

23  Service after a report was made by a lender named TD Bank.

24  TD Bank brought forth documents and alleged that the defendant

25  provided fictitious documents, both inflating her income and

1  net worth, in order to qualify for a one point approximately

2  six million dollar loan for a home in Raleigh.  When

3  investigations continued in this matter, there were a number of

4  findings that suggested the defendant also, knowing the rules

5  of the Fair Credit Reporting Act, provided documents, namely

6  fictitious police reports or altered police reports, to lending

7  institutions to exonerate herself of any bad credit in order to

8  qualify for additional loans.

9  Q    Is it your understanding that the Fair Credit Reporting

10 Act imposes an obligation on a financial institution if they

11 are informed that someone has had an identity stolen?

12 A    Yes, it is.

13 Q    Okay.  What is your understanding as to the Fair Credit

14 Reporting Act requirements for those banks?

15 A    Basically with the claim that there has been an identity

16 theft against an individual's credit, the Fair Credit Reporting

17 Act states that given a police report to that point to one of

18 the three major credit reporting agencies, they have an

19 allotment of time, if I recall correctly, it's around 48 hours,

20 to either conduct the investigation, to substantiate the claim,

21 or to remove the credit mar off that individual's credit

22 report.

23 Q    Now, with regard to the defendant in this case, you are

24 aware that she was -- she had an initial appearance before

25 Magistrate Judge Gates on June 26, 2014, correct?

1  A    Yes.

2  Q    And you are aware that on that date she was placed on

3  presentence release by the Court, correct?

4  A    Yes, I was.

5  Q    And are you aware of the condition that she is required to

6  get permission of the probation officer prior to obtaining any

7  credit?

8  A    Yes, sir.

9  Q    Are you familiar with the condition that she is not to

10 break or engage in any violation of law?

11 A    Yes, I am.

12 Q    Now, with regard to the defendant in this case, after her

13 initial appearance there was another investigation or continued

14 investigation by the Secret Service, correct?

15 A    Correct.

16 Q    Could you please tell the Court a little bit about what

17 was found with regard to any loans or applications for loans

18 made by the defendant after her arraignment -- I mean, after

19 her initial appearance.

20        THE COURT:  Let's hold it right here just a second.

21        Now, we had a crucial date in this matter of

22 June 26th, that's the appearance before the Magistrate Judge,

23 the initial appearance and explanation of the charges then

24 pending; and then on September 9, just 30 days ago,

25 thereabouts, is when she actually pled to the criminal

 1  information.
 2          THE CLERK:  Your Honor, it's actually September the
 3  8th.  Her arraignment was on the 8th.
 4          THE COURT:  It was on the 8th.
 5          THE CLERK:  Yes, sir.
 6          THE COURT:  But Officer Campbell, you got
 7  September 9th in your report.  Do you acknowledge it may have
 8  been the 8th?
 9          PROBATION OFFICER:  Yes, Your Honor, it must have
10  been the 8th.
11          THE COURT:  All right.  I understand.
12          On September 8th those same conditions were
13  continued.
14          Now, where I'm coming from is we could not go --
15  anything I'm going to hear today is only to impact the
16  presentence release issue, and I'm not interested in anything
17  previous to at least the Gates arraignment.  Do you understand?
18          MR. GRAY:  Yes, Your Honor, and it's our intention
19  just to provide that information with regard to that.
20          THE COURT:  All right.  I'll hear you.  Carry on.
21          MR. GRAY:  Thank you, Your Honor.
22  BY MR. GRAY:
23  Q    Now, with regard to post-June 26, 2014, I asked you if
24  there was a continuing investigation that came to the matter of
25  the Secret Service.

1    A    Yes, there was.

2    Q    Would you please tell the Court what information you

3    learned after June 26th of 2014 about the defendant.

4    A    The Secret Service was contacted by a company named

5    Elavon.  Elavon is a credit card processing company.

6              THE COURT:  How do you spell Elavon?

7              THE WITNESS:  E-L-A-V-O-N, to my knowledge, sir.

8    A    Basically in the past the defendant had entered into an

9    agreement with Elavon, formerly known as Nova, to use their

10   services to process credit cards for her businesses, one named

11   MedAccom and one named Hospital Traveler.  The defendant --

12   Elavon indicated that the defendant left bad debt with both of

13   those accounts and as a result the company, Elavon, formerly

14   known as Nova, secured judgments against the defendant in both

15   cases because of her -- because of her debt.

16   Q    Now, Agent, I do want to just kind of turn your attention

17   to -- just to kind of move forward on the matter.

18              As a result of this loan with Elavon, what did you

19   learn as a result of -- well, what took place as a result of

20   this loan with Elavon with regard to the Secret Service,

21   after -- well, what came to the Secret Service after June 26th?

22   A    There was a company named Direct Capital.  Direct Capital

23   is a lender who was in negotiation with the defendant who had

24   sought a $150,000 loan from the lender.  When they attempted to

25   verify if she would be a sufficient risk to take, they noticed

1  that there was a mar on her credit by Elavon because of the two

2  judgments that I had previously mentioned.

3  Q    So as a result of that finding, what steps did you take

4  investigatively?

5  A    We discovered that Elavon had been provided with a request

6  to write a letter on the defendant's behalf stating that she

7  had never obtained credit from them and therefore was a victim

8  of identity theft, and further that they had received a police

9  report substantiating that fact.

10          THE COURT:  All right.  Now, when did this occur?

11          THE WITNESS:  I do not recall the exact date, sir.  I

12  do know that it was after the initial appearance.

13  BY MR. GRAY:

14  Q    Now, Agent Turner -- and this may help answer the Court's

15  question.  Agent Turner, with regard to this -- with regard to

16  this statement that the defendant had made a request to correct

17  her credit history, was there a -- were any documents received

18  by the Secret Service with regard to that inquiry, that attempt

19  to correct her credit history?

20  A    Yes, there were.  There were internal records maintained

21  by Elavon.

22  Q    I want to show you what's been previously marked as

23  Government Exhibit Number 1 for the purposes of this hearing,

24  it's been previously provided to the defense counsel.  I'm

25  going to show it to you on the screen.

1              Okay.  Agent Turner, have you seen this document

2    before?

3    A    I have.

4    Q    Are you familiar with what this document is?

5    A    I am.

6    Q    What is it?

7    A    This is a fax cover sheet that was -- prefaced the police

8    report we recently referred to.

9    Q    And this fax, was this sent to one of the creditors,

10   credit companies?

11   A    Yes, it was.  This was provided to Elavon.

12   Q    And it appears that -- and I want to draw your attention

13   to the upper highlighted portion.  It appears that the date on

14   this is September 5th, 2014.

15   A    Yes, sir, that's correct.

16   Q    Is that the date that it was received by the credit

17   company?

18   A    Yes, sir.

19   Q    Within this document, it also has -- at the bottom portion

20   it has a date that says 2014 -- I mean, I'm sorry,

21   September 5th, 2014 at the bottom.  Is that also reflective of

22   the date that this was sent to the credit company?

23   A    Yes, it is.

24   Q    With regard to this fax, what was the purpose of this fax?

25   A    This was used to provide the police report to Elavon,

1    stating that the defendant's company was a victim of identity

2    theft, fraud, of their tax I.D. number.

3    Q    And along with this fax, were any other documents sent to

4    the credit company to help try to resolve this issue?

5    A    Yes, they were.  This was the preface to the police report

6    that was provided.

7             MR. GRAY:  Your Honor, I'd like to move for the

8    admission of Government Exhibit Number 1 at this time.

9             THE COURT:  Let it be admitted.

10            MR. GRAY:  Thank you.

11   BY MR. GRAY:

12   Q    Agent Turner, I want to show you what's been previously

13   marked as Government Exhibit Number 2 for identification.  Can

14   you identify what that document is.

15   A    I can.  This is the altered police report as provided by

16   the previous fax cover.  This was sent to the company Elavon.

17   Q    So this was the document that accompanied the fax cover

18   sheet?  So this is the police report that was mentioned in the

19   cover sheet?

20   A    That's correct.

21   Q    Which is Government Exhibit 1?

22   A    Yes.

23   Q    And this document, you've had an opportunity to see it

24   before, correct?

25   A    I have.

1  Q    Where did you get this document from?

2  A    I got it from the company Elavon.

3  Q    So Elavon provided this document to you, and did they tell

4  you what this document was meant to represent?

5  A    Yes, that the company the defendant owned or operated was

6  in fact a victim of identity theft.

7  Q    Now, as a result of getting this document, what

8  investigative steps did you take as a Secret Service agent?

9  A    I contacted the Vance County Sheriff's Office and

10 requested a copy of the official police report under that same

11 case number.

12 Q    I'm going to show you what's --

13         MR. GRAY:  At this time, Your Honor, I'd like to move

14 for the admission of Government Exhibit Number 2.

15         THE COURT:  Let it be admitted.

16         MR. GRAY:  Thank you, Your Honor.

17 BY MR. GRAY:

18 Q    Agent Turner, I'm going to show you what's been previously

19 marked as Government Exhibit Number 3 for identification.  Do

20 you know what that document is?

21 A    Yes, sir, this is the official case report from the exact

22 same case number as provided by the Vance County Sheriff's

23 Office.

24 Q    Now, Agent Turner, you mentioned earlier that the document

25 that was shown as Government Exhibit Number 2 was an altered

1   police report.

2   A     That's correct.

3   Q     With regard to the alterations, is it your testimony that

4   Government Exhibit Number 3 is the actual police report?

5   A     This is the official file as provided to me under that

6   case number by the Vance County Sheriff's Office.

7   Q     I want to show you Government Exhibits 2 and 3 side by

8   side, and I have a couple of portions that are highlighted.

9            I'd like to turn your attention to the first

10  highlighted portion.  It looks like it says OCA and it appears

11  that there is a case number there.  Is that reflective of the

12  case number by Vance County?

13  A     Yes, it is.

14  Q     Were the case numbers on Exhibits 2 and 3 the same?

15  A     Yes, they are.

16  Q     With regard to the third block, there is a block that says

17  "Victim," do you see that on the left-hand side?

18  A     Yes, I do.

19  Q     Where it says "victim," are the names the same?

20  A     No, they're not.

21  Q     Have those been altered?

22  A     Yes, they have.

23  Q     We're going to turn to the second page on both documents.

24           On Government Exhibit 2 and at Government Exhibit

25  Number 3, have there been changes or alterations made between

1    those two documents?

2    A    Yes, there have.

3    Q    I note within the narrative there were some changes that

4    were made, particularly in the first line.  Do you see those?

5    Do you see that highlighted section?

6    A    I do.

7    Q    Is T. Lyn Fletcher the same person as Teresa Carden?

8    A    Yes, it is.

9    Q    And how do you know that?

10   A    I've seen that name in a plethora of documents that I've

11   gathered throughout the course of the investigation, which

12   ultimately identify the defendant.

13   Q    Now, with regard to these two documents, what was the

14   purpose or what was the purpose identified by Elavon as to why

15   they received the police report which is Government Exhibit

16   Number 2?

17   A    To declare that the companies run by the defendant were

18   victims of identity theft and therefore not responsible for the

19   debt that was accrued with their organization.

20   Q    Now, Agent Turner, you mentioned that you were previously

21   familiar with the Fair Credit Reporting Act, correct?

22   A    Yes.

23   Q    As a result of receiving Government Exhibit Number 2, was

24   there an obligation on behalf of Elavon to take any steps with

25   regard to the defendant's credit report?

1   A    It was to initiate an investigation and either

2   substantiate or release the claims of fraud against the –– one

3   of the three credit reporting agencies for their debt.

4   Q    Did Elavon inform you upon which date they received the

5   initial inquiry with regard to trying to get this matter

6   cleared up, specifically when the defendant contacted them to

7   try to get her credit history cleared up?

8   A    They did give me a date, and I apologize, I cannot recall.

9   Q    Was that date on or about the 5th of September, 2014?

10  A    Yes, it was.  It was just a day or two after one of the

11  appearances for the defendant.

12  Q    You had an opportunity to read the documents with regard

13  to the matters she provided to Elavon.  Did she at any point in

14  time state that she had lost or was a victim of identity theft?

15  A    No, sir.

16  Q    Did she claim within any of the documents she provided

17  that she was trying to get her credit repaired?

18  A    No, sir.

19  Q    And these documents that you received with regard to the

20  Vance County Sheriff's report, did you receive that from –– did

21  you receive that from Elavon or did you receive that from Vance

22  County?

23  A    If you would ask me again, which report?  I received the

24  genuine copy from Vance County and I received the fictitious

25  copy from Elavon.

1    Q     Thank you.

2              And with regard to the loan that took place from

3    Direct Capital, did that loan take place -- or did that request

4    or the application take place in August of 2014?

5    A     Yes, it did.

6              MR. GRAY:  No further questions, Your Honor.

7              THE COURT:  All right.  Counsel for defendant,

8    Mr. LeLiever, do you have questions of Special Agent Turner?

9              MR. LeLIEVER:  Yes.

10             THE COURT:  You may proceed.

11                        - - - - -

12                     CROSS-EXAMINATION

13   BY MR. LeLIEVER:

14   Q     Mr. Turner, just on that last question, you just testified

15   to the Court that the loan took place with Direct Capital.

16   Is that what you just said to the Court?

17   A     Yes, sir.

18   Q     How do you know that the loan took place?

19   A     They told us that the loan had closed.

20   Q     Would you be surprised to know that the loan never closed

21   and that the loan was never given to my client?

22   A     That would be in conflict with what we were told.  We are

23   still waiting subpoenaed information.

24   Q     Now, let me ask you, in your investigation, my client,

25   Teresa Lyn Fletcher, did not actually apply for the loan; is

1  that correct?  It wasn't in her name, I guess I should say?

2  A    I do not recall.  We haven't seen the documents as were

3  demanded by the subpoena to this point.

4  Q    Okay.  Were you given any e-mails from Direct Capital

5  about the -- e-mails between Direct Capital and my client?

6  A    No, sir.

7  Q    Were you given any communication from Elavon about

8  communications with my client?

9  A    Yes, we were.

10  Q    Okay.  And Elavon actually, you testified earlier -- let

11  me just go back.

12         You testified earlier that Elavon told you that my

13  client wanted them to investigate and report to the credit

14  agencies; is that correct?

15  A    Yes, sir.

16  Q    But actually in the letter and in truth isn't it also

17  correct that my client asked them to investigate and write a

18  letter to Direct Capital; is that correct?

19  A    To write a letter to Direct Capital?

20  Q    To Direct Capital about what the debt status was.

21  A    No, I believe what the request was is that they write a

22  letter declaring that she had never established an account.

23  Q    Agent Turner, you are aware that this entire loan that is

24  being testified about today was actually a loan for Hospital

25  Travelers?

1    A    Correct.

2    Q    You are aware of that, correct?

3    A    I'm aware that it was a working capital loan, yes.

4    Q    Okay.  For Hospital Travelers?

5    A    Yes.

6    Q    So it was a corporation loan, correct?

7    A    Correct.

8    Q    And there was more than one person that signed for that

9    loan; isn't that correct?

10   A    Again, I do not know.  I have not seen the subpoenaed loan

11   documents.

12   Q    Did you know that other stockholders in that company also

13   had to sign for this loan?

14   A    No, I -- again, I can't testify to something I haven't

15   seen.

16   Q    Did you know the loan was used for a corporate purpose,

17   was going to be used for a corporate purpose?

18   A    The intentions of the defendant for the money, I have -- I

19   can't speak to either.

20   Q    Did you know that my client actually had another loan with

21   a subsidiary of Direct Capital?

22   A    No, sir.

23   Q    My client being -- well, actually, that's not my client.

24   Hospital Travelers, the same company that applied for this

25   loan, actually had, I believe, a loan for an Apple Macintosh

1   computer just from 2014, maybe in September, they had just

2   gotten a loan I believe with a subsidiary of Direct Capital;

3   were you aware of that?

4   A    No, sir.

5   Q    And are you aware that they're current with that loan?

6   A    No, I'm not.  I'm not aware of any --

7   Q    I want to go back to these exhibits that are 2 and 3.

8        You testified earlier that number 2 you believe was a

9   forged document, forged police report, correct?

10  A    I'm testifying that it is different from the original that

11  I received from Vance County, that's correct.

12  Q    You cannot say that it was forged, can you?

13  A    I can say that it differs from Vance County.

14  Q    Have you ever done an incident or investigation report,

15  and I don't mean to demean you in any way, but just asking the

16  basic question, have you ever written one of these reports?

17  A    Yes, sir.

18  Q    And sometimes when you write these reports, they are

19  updated at later times; is that correct?

20  A    They can be updated, but only under an addendum.  A

21  previous page that has been written cannot be changed.

22  Q    Okay.  For instance, page 2 of -- 2 and 3, it goes over --

23  assigned to Detective Wilkerson, later in the comment -- in the

24  narrative section, and then it actually says supplement 3, do

25  you agree that Clerk Betty Bobbitt on 9-2-2011 -- do you see

 1    where Clerk Betty Bobbitt gave a supplement, number 3?

 2    A    I do not have any picture of what you're referring to

 3    right now.

 4    Q    Exhibit 2 or 3 -- 2 and 3 actually say it.

 5    A    I can go off memory, and I don't recall.

 6              MR. LeLIEVER:  Your Honor, can I approach?

 7              It's Government Exhibit 2, if you could bring that

 8    up, page 2, that was just shown to the witness, but I can

 9    approach, if you'd like, but --

10              THE COURT:  You may.

11    A    I have a picture now, sir.

12    Q    You have a picture now?

13    A    I do.

14    Q    Okay.  So on page 2 of Exhibit -- is this Exhibit 2?

15    I believe it is.  Do you see, I guess, at the bottom of the

16    page, do you see the word "supplement" there?

17    A    Yes, I do.

18    Q    And supplement 3, correct?

19    A    I do see supplement 3.

20    Q    So supplement 3 would infer that there was a supplement 2,

21    correct?

22    A    I can only assume.

23    Q    But you see supplement 3, how it was entered by the clerk,

24    correct?

25    A    I see where it says supplement 3, Clerk Betty C. or G.

1    Bobbitt, 1 -- possibly 32.

2    Q    Okay.  In the supplement by Detective Wilkerson -- and you

3    can see that right under Bobbitt, correct?

4    A    Yes.

5    Q    And then on page 3 of this exhibit, did you notice that at

6    the very bottom of the narrative section it said -- and this is

7    the one that you believe was a forged document:  Called Vance

8    County Sheriff's Office around 10:20 a.m. on September 5th,

9    2014, asked for Elavon Company in the amount of $13,000 to be

10   added to this report.  That's the -- this is the forged

11   document, correct?  Or, I'm sorry, this is the one that you

12   believe is different than the one that you requested?

13   A    Correct.

14   Q    Okay.  Can we go to Exhibit 3, the Government's Exhibit 3,

15   please.  And on the third page of that exhibit, on the end of

16   the narrative section, it states:  Ms. Teresa Carden called the

17   Vance County Sheriff's Office around 10:20 on September 5th,

18   2014 and asked that Elavon Company in the amount of $13,000 be

19   added to this report.  Is that correct?

20   A    I do see that.

21   Q    So on both reports it says the same thing about Elavon?

22   A    No, sir, they were different.

23   Q    Because one said Carden and one said --

24   A    One said nothing.

25   Q    One said nothing?

1    A    That's correct.

2    Q    Now, can I ask you something?  What is the difference

3    between Carden and Fletcher?

4    A    One is a married name, one is a maiden name.

5    Q    Okay.  So you are aware that Teresa Lyn Fletcher was

6    Teresa Carden for quite some time?

7    A    Yes, sir.

8    Q    And now she is Teresa Lyn Fletcher, correct?

9    A    Yes, sir.

10   Q    Because she's resumed her maiden name.

11   A    Correct.

12   Q    So is it possible that when she called up to the Vance

13   County Sheriff's Office, that they in fact changed that

14   information?

15   A    Well, I mean, anything is possible.  I wasn't privy to

16   that conversation.

17   Q    And again, in your investigation of this instant case, was

18   there any contact between -- that you found between my client

19   and any of the credit reporting agencies?

20   A    I'm sorry, I don't understand what you're asking.

21   Q    I think you testified earlier that my client had never

22   contacted any of the credit reporting agencies during this

23   investigation.  Is that still -- you believe that she had never

24   contacted them about this loan?

25   A    About this particular loan?

1    Q    Yes.

2    A    No, I didn't mean to refer that.  What I'm suggesting is

3    I'm not aware if she contacted directly to Direct Capital, is

4    what I believe I testified to, because I have not gotten any

5    subpoenaed documents from them.

6    Q    And it is correct that the actual Elavon had a -- who is a

7    judgment creditor; is that correct?

8    A    That Elavon is a what now?

9    Q    A judgment creditor, meaning they had a judgment

10   against --

11   A    That's correct.

12   Q    But they had a judgment against Hospital Travelers,

13   correct?

14   A    Correct.

15   Q    They did not have a judgment against Teresa Lyn Fletcher,

16   correct?

17   A    I believe that's true.

18   Q    Or Teresa Carden?

19   A    I know that they have provided documents that had her

20   signing for that loan, but they -- I do not recall the

21   judgments being in her name, that's correct.

22   Q    They were actually in the name of Hospital Travelers.

23   A    Okay.

24   Q    Okay.

25   A    Correct.

1          MR. LeLIEVER:  I don't have any other questions,
2    Your Honor.
3          THE COURT:  All right.  Do you have any more for
4    Mr. Turner?
5          MR. GRAY:  Yes, Your Honor, just briefly, follow-up
6    question.
7                    - - - - -
8                REDIRECT EXAMINATION
9    BY MR. GRAY:
10   Q    Agent Turner, with regard to Government's Exhibits 2 and
11   3, where it says "victim," would you please take a look at the
12   "victim" column for both of those documents.  I'm going to pan
13   that out for you.  Within that "victim" section --
14   A    Yes, sir.
15   Q    -- the addresses of the victim, are those the same?
16   A    They are not.
17   Q    With regard to page 3 of both documents, Government
18   Exhibit 1, Government Exhibit 2 and 3, the last paragraph,
19   where it -- on Government Exhibit 3 it says:  Ms. Teresa Carden
20   called, is there -- and on Government Exhibit 2, does it appear
21   that there was an alteration between those two documents?
22   A    It appears as though there was at minimum an omission.
23   Q    Now, Agent Turner, you contacted the Vance County
24   Sheriff's Office to obtain Government Exhibit Number 3.
25   A    I did.

1  Q    Did they tell you that there had -- you know, there hadn't

2  been any changes or they had made changes with regard to those

3  reflected between Government's Exhibit 2 and 3?

4  A    They had.

5  Q    And what did they tell you with regard to Government

6  Exhibit Number 3?

7  A    They told me that this was the official file that they

8  maintain with all the contact from the defendant.

9  Q    And did they give an indication as to whether or not they

10  had a copy of Exhibit Number 2?

11  A    When I asked if this was all that they had in conjunction

12  with this file, they confirmed that it was.

13  Q    So based upon your investigation, Government Exhibit 3 is

14  the only copy that's in possession by Vance County Sheriff's

15  Department?

16  A    Correct.

17  Q    Now, Agent Turner, with regard to --

18          THE COURT:  Okay.  I've heard enough.  What else you

19  got from him?

20          MR. GRAY:  Your Honor, just briefly, one last

21  question for him.

22          THE COURT:  Okay.

23  BY MR. GRAY:

24  Q    Is this the only county sheriff's department that you

25  received an altered document from?

1    A     No, sir.

2    Q     What other counties did you receive altered documents from

3    regarding the defendant?

4    A     Durham County Sheriff's Office.

5    Q     Thank you.  And do you remember when those altered

6    documents were provided to you?

7    A     Within the last -- let's see.  Yesterday or the day

8    before.

9            MR. GRAY:  Thank you.  No further questions,

10   Your Honor.

11           THE COURT:  All right.  You may step down.

12           MR. LeLIEVER:  Your Honor, can I ask him a question

13   about --

14           THE COURT:  No, you may not.  You may approach the

15   bench, both counsel and probation officer.

16             (The following bench conference was held.)

17           THE COURT:  All right.  Now, Mr. U.S. Attorney, the

18   conditions is what the allegation is have been violated.  The

19   only condition that possibly applies here is she cannot apply

20   for new credit or open a bank account without the permission of

21   a probation officer.  Now, all this stuff that we're hearing,

22   this well may be obstruction or it may be intimidating or

23   impeding, well, that's enhancements in the presentence report

24   to be determined at the time of sentencing.  Unless you've got

25   something clearly where she attempted to get a new line of

1  credit or open a bank account without probation officer, I

2  don't have anything to go on.  Go ahead.

3        MR. GRAY:  Your Honor, we did have --

4        THE COURT:  All we're doing is talking about

5  presentencing confinement, so go ahead.

6        MR. GRAY:  I'm sorry, Your Honor, with regard to the

7  agent's testimony, he did testify that there was the loan that

8  was made by Direct Loan that took place in August of this year.

9        THE COURT:  Okay.  But when was it applied for?

10       MR. GRAY:  Well, he testified as to August, so I

11  don't have --

12       THE COURT:  I mean, yeah, it could be 8 or something.

13  He doesn't have even the backup stuff of what you're showing

14  today.  I'm going to have to toss you out today.

15       Now, again, you better get her straight.  I think

16  she's getting very close to obstruction and impeding and so

17  forth and so on, and those are proper enhancements under

18  sentencing guidelines, but as of this time, I've got to follow

19  exactly what these two judges put down and it was open a new

20  bank account or apply for new credit, and we don't have that in

21  black and white, okay?

22       MR. GRAY:  Thank you, Your Honor.

23       THE COURT:  Go back.

24   (End of bench conference.  Proceedings resume in open court.)

25       THE COURT:  In this matter before the Court at the

1  request of the probation department, the Court has conducted a

2  hearing in order to determine if the defendant has violated the

3  conditions of her pretrial release, and the only condition that

4  could apply based on the general evidence I've seen is the

5  condition that she not apply for new credit or open a bank

6  account after the beginning date of whatever it was, June 26th.

7  I haven't heard anything directly on that point and I'm going

8  to find that the Court is not satisfied with that and I'm going

9  to continue her on the conditions that she was released on by

10  both previous judges.

11        Now, I cautioned Counsel, and you may inform your

12  client, that certain of these type actions could be considered,

13  I don't know without all the facts, as enhancements or

14  obstruction or impeding, and that could cause her more trouble.

15  I recommend that Counsel advise her of all those issues.

16        I'm dismissing this matter and continuing her under

17  the same conditions.  That's all.

18        The Court will be adjourned, Marshal.

19                          – – – – –

20        (Proceedings concluded at 3:01 p.m.)

21                          – – – – –

22

23

24

25

1          C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a pretrial release violation hearing in

5    the United States District Court is a true and accurate

6    transcript of the proceedings taken by me in machine shorthand

7    and transcribed by computer under my supervision, this the 20th

8    day of February, 2015.

9

10

11                                    /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25