1          IN THE UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF NORTH CAROLINA
                 WESTERN DIVISION
3

4   UNITED STATES OF AMERICA,      )
                                   )
5                                  )
                                   ) Case No.
6                                  ) 5:14-CR-00120-H-1
                                   )
7   TERESA LYN FLETCHER,           )
                 Defendant.        )
8   _____

9
          MOTION HEARING and SENTENCING HEARING
10        BEFORE SENIOR JUDGE MALCOLM J. HOWARD
               FEBRUARY 24, 2015; 12:23 P.M.
11                GREENVILLE, NORTH CAROLINA
    _____
12

13  **FOR THE GOVERNMENT:**

    Adam F. Hulbig
14  Assistant U.S. Attorney
    310 New Bern Avenue, Suite 800
15  Raleigh, North Carolina  27601-1461

16  **FOR THE DEFENDANT:**

17  William Andrew LeLiever
    5 West Hargett Street
18  Suite 310
    Raleigh, North Carolina  27601

19

20

21

22          Proceedings recorded by mechanical stenography,
    transcript produced by computer.
23  _____

24          **DAVID J. COLLIER, RMR, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25                  413 MIDDLE STREET
                 NEW BERN, NC  28560

```
 1                    P R O C E E D I N G S
 2                     – – – o0o – – –
 3          THE COURT:  I'm going to begin the matter by calling
 4     the case of United States versus Teresa Lyn Fletcher.  Let the
 5     record reflect the Court acknowledges that the Assistant
 6     U.S. Attorney and the prosecutor in this case, Mr. Adam Hulbig,
 7     is present, as is defense counsel, Mr. William LeLiever, and
 8     the defendant, Ms. Teresa Lyn Fletcher.
 9               This Court previously had received a motion by the
10     United States for a hearing which was filed on February 13th,
11     2015, a hearing to relieve the Government of certain
12     obligations under the plea agreement, and by order set that was
13     entered on February 19th, the Court ordered that upon motion of
14     the United States and for good cause, the Court will convene a
15     hearing contemporaneously with the sentencing hearing to
16     determine whether the defendant has breached the
17     plea agreement.  So I'll begin with that issue first before we
18     take up the matters re: sentencing and inquire and let the
19     United States go ahead and present its contentions as relates
20     to its motion so just referred to.  Mr. Hulbig.
21               MR. HULBIG:  Thank you, Your Honor.
22               As Your Honor indicated, the Government did move in
23     this case to be relieved of its stipulation in the
24     plea agreement with the defendant for a three level reduction
25     for acceptance of responsibility.  As set forth in the
```

1  Government's moving papers, Your Honor, there are various bases

2  for that request for relief, primarily the defendant's criminal

3  conduct following her initial appearance in this case.

4        The plea agreement that the Government entered into

5  with the defendant provided, among other things, that the

6  defendant was required to abide by any release conditions set

7  by the Court, those release conditions that Judge Gates set

8  back in June, 2014 included a condition that she not violate

9  any Federal, State or local laws.

10        As it came to the Government's attention at a later

11  date, after her plea hearing out here before Magistrate Judge

12  Swank, Your Honor, the Government learned that the defendant

13  had continued to persist in the types of illegal bank fraud,

14  identity theft type schemes that she had engaged in prior to

15  her plea in this case, and much of the conduct that occurred

16  following her initial appearance was connected by the modus

17  operandi of the charges that she pled to.

18        Among other things, the defendant wired counterfeit

19  bank and tax records to a lender in New Hampshire, that was a

20  company Direct Capital, where the defendant had sought a

21  $100,000 working capital loan.  She, after she had release

22  conditions imposed, wired counterfeit police reports to a

23  creditor in Tennessee.  The purpose of using those counterfeit

24  police reports was to try to get Elavon, which is a judgment

25  creditor of the defendant, to try to get that creditor to

1   release its monetary judgments against the defendant.

2         After her initial appearance, she wired a counterfeit

3   bank letter to a creditor in Illinois, again, in a fraudulent

4   attempt to get that creditor to remove negative history on her

5   credit report which had been triggered by her bouncing checks

6   for the payment on the financing of an Audi.

7         She also wired two counterfeit bank letters to

8   Arizona's Medicaid agency in a fraudulent attempt to convince

9   that agency that she had valid business accounts.

10        As part of her schemes following her entry of plea in

11  this case, Your Honor, she used the means of identification of

12  at least two individuals to facilitate fraud, both of those

13  individuals -- one is a former employee of NewBridge Bank,

14  Monica Navarro, and the other is a current employee of SECU,

15  Jonathan Wheeler.  In both cases the defendant purported to

16  provide letters that were drafted by those individuals on to

17  creditors so that the creditors would take, you know, stock and

18  faith in what she'd provided, but in fact those individuals

19  never consented to the use of their identities for this

20  purpose.

21        I think, Your Honor, the record that the defendant

22  has established while she was on supervision is deplorable,

23  I think that it shows a refusal to separate herself from the

24  criminal conduct that led her here in the first place, and she

25  had an initial appearance before Magistrate Judge Gates, a plea

1   hearing before Magistrate Judge Swank and a revocation hearing

2   before Your Honor, and in none of those, despite all those

3   interactions with the Court, three different jurists, the

4   defendant proceeded unphased to continue committing the same

5   types of crimes.

6          Ultimately, Your Honor, the plea agreement is a

7   contract between the Government and the defendant, and this

8   contract specifically provides in paragraph 5 that if there are

9   any conditions that are changed with respect to the

10   Government's agreements on the stipulations for sentencing,

11   that the contract becomes voidable, in essence, and so here,

12   Your Honor, we would submit that there is basis for the

13   Government to be relieved of its plea stipulation for

14   acceptance.

15          In doing some case law research, there was not a lot

16   of Fourth Circuit cases on the issue of how to resolve a

17   defendant's misconduct in terms of the context of the

18   plea agreement, although I did find a few, one of which

19   Your Honor was involved in, the case of United States versus

20   Tann, which is 220 Federal Appendix 204.  In that case,

21   Your Honor, the defendant Temeka Tann had been convicted for

22   conspiracy to distribute and possess more than five grams of

23   cocaine base.  After her plea agreement was entered by the

24   Court, the defendant in that case went on to sell more drugs

25   and was caught.  In that case the Government, as the Government

1   is doing here, moved to be relieved from the plea stipulation

2   with respect to acceptance, and in that case Your Honor found

3   that that was warranted based on the record and it went up to

4   the Fourth Circuit on appeal, which affirmed your order, Judge,

5   on March 1st, 2007.

6           So that's the motion for relief that we're seeking,

7   Your Honor.  Thank you.

8           THE COURT:  Thank you, Mr. Hulbig.

9           Mr. LeLiever, do you have a response you desire the

10  Court to consider on those issues?

11          MR. LELIEVER:  I do have a response, Your Honor.

12          THE COURT:  All right.

13          MR. LELIEVER:  As to the facts, my client doesn't

14  wish to disagree with any of the facts the Government has

15  brought up; however, we would object to the Government being

16  allowed to get out of their obligations under the

17  plea agreement, and we would do that -- just to give you some

18  more background, I think the U.S. Government has done a great

19  job so far in what has been filed, but the first document

20  actually filed was -- well, my client was actually indicted on

21  four separate charges, two for the fraud for the Bank of

22  North Carolina and two for the TD Bank.  At that time and after

23  we received discovery we went over that and we approached the

24  Government about expanding that to include more charges, and

25  the superseding criminal information, I believe, that my client

1   ended up pleading to included also a count of wire fraud from

2   the insurance off of the house.

3           So as far as acceptance of responsibility, she did

4   that not only to the initial indictment but also to the

5   superseding indictment, which she did, as well as also doing a

6   consent order that Your Honor has signed, I believe Your Honor

7   has signed, to then disburse the property that she has to the

8   people that it rightfully belongs to, as well as some of the

9   property she's tried to distribute as well.

10          Now, I think the Government is correct that once she

11  got charged with this, once she got into the plea, one would

12  feel like someone should automatically just be able to snap

13  their fingers and come to the realization, well, I need to

14  change my entire conduct.  Unlike the case law that was

15  presented, this isn't someone who goes down to the street

16  corner and sells drugs, this is someone that -- and it isn't

17  something that just happened once or twice, this is -- and

18  I think the Government, the Probation has done a great job of

19  showing this conduct that's happened over a long, long period

20  of time, and it's something that my client has been accustomed

21  to, and there's some -- some record -- well, there's very --

22  there's a lot of recognition of what she did was wrong, but

23  when we were in front of you on the initial revocation hearing,

24  the question was not whether or not she did it, because I think

25  that was relevant and obvious that she had done it.  I think

the Court had dismissed that because we didn't know what time period the actual application happened and everything of that nature. And the Court had said at that point, well, we're going to answer for this at sentencing. My client knew that all along, that she was going to have to answer for this at sentencing, it wasn't a question of whether she did it or not, it was whether or not it was done during that applicable time, which it was, just the evidence that was presented at that time, that wasn't included.

Your Honor, I think that my client -- and she's asked me to say to the Court that she has accepted responsibility, she has filled out a form with the probation officer, probation office, to accept that responsibility. To say she's done so in a timely manner would be untrue, to say the very least, it's just she has not done everything in her power in a timely manner in the way that you'd expect her to do it.

The Court -- I can understand any frustration that the U.S. Government has and the Court has with how this matter has been handled by my client, but the acceptance of responsibility she's had since day one. She knew that she did the wrong thing. She signed the plea. She knew she had to because she did it.

As you can see from her record, a lot of these charges in Wake County and things of that nature, even some of the things that have been brought up, she has a number of civil

1    judgments on her, a number of things that have been paid off so
2    the charges were dismissed, things of that nature.  She's been
3    able to try and fix what's happened to her in the past.  She's
4    in front of you today because she can't fix it.  It's gotten to
5    the point it's unrepairable and that's why we're here at
6    sentencing.
7           This motion by the Government, my client completely
8    understands why the Government filed it, takes full
9    responsibility for her actions, knows that what she did was
10   wrong and knows that what the Government has just told the
11   Court is true, but she stands before you with the charges that
12   she's pled to in the sentencing that she's about to get and
13   with the case law that we've just been presented with, that --
14   some of the cases -- a case that the Government actually
15   charged the additional offenses for the drugs.  Now, my client
16   concedes that actually I think the Government could have
17   charged some of the offenses here, and I don't know how the
18   Government is going to deal with that, she just wants the Court
19   to know that she does accept responsibility for it but she
20   understands that if the Court makes the ruling, she's not
21   disputing the facts, Your Honor, but she just wants to know --
22   let the Court know that she does accept responsibility, she
23   does know what she did was wrong, and especially what the
24   Government has just told you of what has transpired this past
25   year.

1    So, Your Honor, that's all my client would like to

2  say at this time.

3    THE COURT:  Thank you, Mr. LeLiever.

4    Anything else, Mr. U.S. Attorney?  I don't know of

5  anything.

6    MR. HULBIG:  I'm sorry, Your Honor?

7    THE COURT:  I don't ask for anything specific, but do

8  you have anything else you want to --

9    MR. HULBIG:  Your Honor, I would only add that many

10  of the issues raised by counsel relate to application of the

11  3553(a) factors.  I think the issue here is whether there was a

12  breach of the contract that the defendant entered into with the

13  Government, and as I indicated, part of that contract was that

14  she abide by the conditions, which she did not, she went on to

15  commit new offenses, and acceptance of responsibility is a --

16    THE COURT:  Thank you very much.  You may be seated.

17    MR. HULBIG:  Thank you, Your Honor.

18    THE COURT:  The Court has carefully reviewed the

19  written motion of the United States that sets out in detail the

20  various issues that have been further alluded to and made a

21  part of the statement of the Government attorney this

22  afternoon.  The Court is satisfied by a preponderance of the

23  evidence that the defendant has materially breached the terms

24  of the agreement by her continuing to exercise conduct of a

25  criminal nature following her original appearance before the

Court where conditions were set on June 26, 2014 and further by the entry of the plea agreement on September 8, 2014.

Accordingly, the Court finds that the defendant did breach the agreements and the United States is thusly entitled to be relieved of at least the paragraph for acceptance of responsibility, that is paragraph 5D, page 8 of the original plea agreement, which provided for a downward adjustment of two levels for acceptance of responsibility and then an additional level if her level was over 16, i.e. the three points.

That's the ruling of the Court. Does the United States wish me to clarify anything further on that?

MR. HULBIG: No, thank you, Your Honor. I appreciate you making the ruling.

THE COURT: Does the defendant desire anything further?

MR. LELIEVER: No, Your Honor.

THE COURT: Then next I'm going to move to the sentencing hearing.

Do you want to go straight ahead into the sentencing hearing in the case of United States versus Fletcher or do you need a break for some reason? I'll be glad to give you five minutes if you want a brief --

MR. LELIEVER: Your Honor, I don't believe I need a break. I'm ready to go.

THE COURT: Mr. Hulbig, are you ready to go forward?

1    MR. HULBIG:  We're ready, Your Honor.

2    THE COURT:  Then in this case, as in all cases before

3  this Court, I follow the dictates in sentencing hearings set

4  out in the Fourth Circuit case United States versus Hughes some

5  years ago, which I believe to be still the law, which provides

6  and directs that a District Court shall calculate and make the

7  appropriate findings of fact as to the range prescribed by the

8  guidelines, then the Court will consider that range as well as

9  other factors set forth in 18 U.S. Code Section 3553(a) before

10 imposing a sentence.  If the Court were to impose a sentence

11 outside the guideline range, it will state its reasons for

12 doing so.

13    So again now focusing on the sentencing hearing and

14 the matter of United States versus Teresa Lyn Fletcher, let the

15 record be clear that she and her counsel, Mr. William LeLiever,

16 are present, counsel for United States, Mr. Adam Hulbig is

17 present.

18    I begin by noting -- I believe there are several

19 objections.  One of the objections, the defendant objects to

20 not receiving a reduction for acceptance of responsibility.  I

21 am denying that objection based on the previous ruling just now

22 on the matter.

23    There remains, I believe, Mr. LeLiever, some issues

24 about the amount of loss and then maybe another one; is that

25 correct, sir?

1          MR. LELIEVER:  Your Honor, yes, I believe there was

2     three main issues on the objections, three main objections.

3          THE COURT:  Well, one of them was the one about

4     acceptance of responsibility, correct?

5          MR. LELIEVER:  That's correct.  I believe that was --

6     actually there was four, I'm sorry, Your Honor.

7          THE COURT:  Okay.

8          MR. LELIEVER:  Number 3 dealt with acceptance, and

9     that was paragraphs 4, 34, 90 and 93, and I'm looking at page,

10    I guess, 2 of 3 of the addendum to the presentence report.

11         THE COURT:  Correct.  I am too.

12         MR. LELIEVER:  So, yeah, 3 has already been --

13         THE COURT:  Ruled on.

14         MR. LELIEVER:  -- taken care of by Your Honor.

15         THE COURT:  So it's the amount of the loss in this

16    matter, correct?

17         MR. LELIEVER:  Number 2 deals with the amount of

18    loss, which is 34, 84, 91 and 93.  We've reviewed that and

19    looked at the objections and the notes of Probation and the

20    Government and at this point we want to withdraw number 2,

21    Your Honor.

22         THE COURT:  Number 2 will be withdrawn and denied.

23         MR. LELIEVER:  And number 1, we would still raise

24    that objection, which is paragraph 20, 23, 29, 31, 34, 82, 91

25    and 93, and that deals basically with the amount of loss in

1  this case, and our specific objection is just to the loan with

2  the Kjellbergs, Your Honor, and it's not with any other amount

3  of loss, it's just with that specific loan.

4        THE COURT:  All right.  Hold it just a second there.

5  I'm trying to find the plea agreement.

6           Did the plea agreement address the amount of loss?

7        MR. LELIEVER:  Yes, Your Honor.

8        THE COURT:  And that has not been adjudicated at all,

9  you're still standing by the plea agreement on that?

10       MR. HULBIG:  Yes, Your Honor, with respect to the

11 remaining provisions.

12       THE COURT:  Then balance me off, is the objection

13 because the amount of loss is greater than --

14       MR. LELIEVER:  Yes, Your Honor.

15       THE COURT:  -- the plea agreement was?

16       MR. LELIEVER:  Yes, Your Honor.

17       THE COURT:  Well, the Government is willing to go

18 back to the plea agreement, correct?

19       MR. HULBIG:  Your Honor, if I could address this just

20 for a moment.

21       THE COURT:  Yes.

22       MR. HULBIG:  The plea agreement covers the three

23 counts of conviction that the defendant pled guilty to, it

24 covers the two bank fraud counts, one as to TD Bank, one as to

25 BNC, and then the third count was the mail fraud as against

1 Liberty Mutual.

2   The Government -- if Your Honor would permit, the

3 Government would propose to walk through how it calculated the

4 sentencing loss under 2B1.1 consistent with the plea agreement,

5 because there is of course two issues, there's what the loss is

6 under -- just within the four walls of the plea and then what

7 the loss is in connection with relevant conduct, which is a

8 different issue.

9   So the Government comes out at a loss of $378,257,

10 and we get to that loss in almost exactly the same way as

11 Probation does.  The only difference between Probation's loss

12 calculation and the Government's is that in the case of

13 Probation, they recommend the assessment of $180,184 for the

14 Kjellberg loan.  The Kjellbergs, Your Honor, were the

15 individuals who entered into a concealed side loan with the

16 defendant in connection with the purchase of the 2905 Cone

17 Manor property.

18   The Government when they -- when we entered into this

19 plea agreement with the defendant, we did not imagine that the

20 Kjellberg loss would be within the scope of the Count 1 of

21 conviction, we viewed Count 1 as victimizing TD Bank and that

22 was what our Federal jurisdiction was over, and so that's how

23 we -- we focused in on how TD Bank was harmed in arriving at

24 that loss stipulation with respect to TD Bank.

25   I think there's a -- there's an immaterial

1   calculation difference between Probation and the Government

2   with respect to the TD Bank loss itself. Probation had

3   information that was -- when they started their PSI process,

4   Your Honor, they discovered that the second trust on the

5   Cone Manor property had been written off completely, it was

6   $180,000, it was a nice clean loss amount.

7        At the time that we were entering into the

8   plea agreement, this information was not fully established and

9   known to the Government, so what I contemplated and what

10   I think Mr. LeLiever contemplated was that we would start with

11   a simple proposition, which is that there were two loans that

12   were fraudulently obtained in connection with this house, one

13   is the first trust, which was approximately 1.4 million, then

14   there was a second trust in the form of the home equity line of

15   credit which was completely exhausted at the closing table and

16   that was 180,443.

17        So we total the loans that TD Bank gave to

18   Ms. Fletcher on the basis of her fraudulent representations and

19   fraudulent documents, and then what we do is subtract the fair

20   market value of the property as it stood in 2013 and that's

21   how -- and then we arrive at a number 136,489 as the number

22   that we get to with respect to Count 1, and as I said,

23   Your Honor, Probation looked at the writeoff of the second

24   trust, 180,000, to arrive at the loss for TD Bank in the PSR.

25        So I hope that that clarifies somewhat.

1    THE COURT:  That didn't clarify anything for me

2  Mr. Hulbig.  You folks are obviously very detailed and

3  knowledgeable about this case, you've been involved with it,

4  what, a year now or something?

5    MR. HULBIG:  Yes, Your Honor.

6    THE COURT:  And I've been involved with it since

7  starting Sunday afternoon reading the presentence report.

8    MR. HULBIG:  I understand, Your Honor.

9    THE COURT:  So are you close together on this thing?

10    MR. LELIEVER:  Your Honor, I am exactly where the

11  Government is with the amount of loss, exactly, with that same

12  number.  The problem is the amount of loss that we are saying

13  and what was under the plea agreement is different than what

14  Probation is saying in the PSR.  That's why I had to make the

15  objection, because the objection was --

16    THE COURT:  I'm satisfied that Probation is just as

17  sincere as you guys are, because they work for the Court and I

18  know this particular probation officer is probably one of the

19  more technical ones that we have as far as the amounts go, but

20  if you folks can agree, the Court is going to accept your

21  agreement.

22    MR. HULBIG:  Your Honor, I think we can agree that

23  the loss is between 200,000 and 400,000, that includes all the

24  counts of conviction, the losses associated with that, as well

25  as the relevant conduct loss.  The only relevant conduct piece

1 where there is any disagreement between the Probation office

2 and the parties is with respect to that Kjellberg loan, as

3 I understand it.

4          THE COURT:  You see, you're going on so long and

5 you're getting into your knowledge and it's confusing me.

6          MR. HULBIG:  Sorry.  Okay.

7          THE COURT:  So paragraph 82, page 20 of 26 of the

8 presentence report, paragraph 82 had set the loss up at 400 but

9 less than 1 million, and that was 14 points.  You're saying

10 it's more than 200 but less than 400.

11          MR. HULBIG:  Correct, Your Honor.

12          THE COURT:  And you both agree to that?

13          MR. LELIEVER:  Yes, Your Honor.

14          THE COURT:  And that was in the plea agreement?  Then

15 I'm going to accept that.

16          So, Mr. Probation Officer, what then would be

17 paragraph 82 under that new acceptance by the Court?

18          MR. WASCO:  Your Honor, total offense level now with

19 all other adjustments taken into account --

20          THE COURT:  No, I just want to get each paragraph.

21 Paragraph 82, what will it go to, 12?

22          MR. WASCO:  12, Your Honor.

23          THE COURT:  All right.  Now, before we go any

24 further -- I'll come back to you, Mr. Wasco -- are there any

25 other objections to the presentence report from Mr. LeLiever?

```
1              MR. LELIEVER:  I had one other objection to paragraph
2    109, it's completely in your discretion, Your Honor, and it's
3    just the objection to make an objection, but the objection
4    really doesn't -- in the end the information is just a factor
5    that the Court may warrant as --
6              THE COURT:  You're talking about the upward
7    adjustment issue?
8              MR. LELIEVER:  That's it, Your Honor.
9              THE COURT:  There's no motion by the United States
10   for an upward adjustment?
11             MR. HULBIG:  No, there's not.
12             THE COURT:  I'm not going to entertain one.
13             MR. LELIEVER:  That's it, Your Honor.  Thank you very
14   very much.
15             THE COURT:  All right.  Now, Mr. Wasco, let's go to
16   the calculations, sir.
17             MR. WASCO:  Yes, sir.
18             THE COURT:  We would be now at a 20?  25, I mean.
19             MR. WASCO:  Yes, sir, Your honor.  25.  The total
20   offense level is a 25.
21             THE COURT:  Hold it a minute.  Let me get the right
22   papers.  I got that at 25.  And the criminal history category
23   is Roman numeral 1.
24             MR. WASCO:  Yes, sir.
25             THE COURT:  And so what would be the custody range as
```

1  it relates to Counts 1, 2 and/or 3?

2           MR. WASCO:  57 to 71 months, Your Honor.

3           THE COURT:  Okay.

4           MR. WASCO:  And the fine range would then change to

5  10,000 to $2 million dollars.

6           THE COURT:  10,000 to 2 million.  And the restitution

7  is at 244,084?  You were making some adjustment, I thought, on

8  that.

9           MR. WASCO:  Your Honor, that's the restitution as I

10  could establish it.  I think that Mr. Hulbig and I spoke

11  yesterday after consulting with the financial litigation unit

12  in the U.S. Attorney's office and there was some direction from

13  them that what we should do to make sure we properly capture

14  restitution is order the entire amount of the two loans

15  together and then when the property is actually sold, she'll

16  get credit for that amount and that will actually arrive at

17  what the accurate restitution would be.

18           THE COURT:  That's more accurate than anything we

19  could pre-estimate.

20           MR. WASCO:  Yes, sir.  It may take some time before

21  we know what that final number is, but we will have a final

22  loss to TD Bank when it's all said and done that's an accurate

23  and final number.

24           THE COURT:  Now, I've done many of these through time

25  with extensions.  It will go in the judgment as it's not yet

1   determined but it would be determined and another order entered

2   not later than six months or something like that.  Can this all

3   be accomplished in that period of time?

4            MR. WASCO:  Your Honor, actually, in this case I'm

5   not sure it can because of the way the foreclosure process

6   works in North Carolina.  Right now the property is in

7   foreclosure, it's set for a March 4th hearing, and if it goes

8   into foreclosure and somebody buys it at foreclosure, under

9   North Carolina law they have another 30 days for the upset

10  bids, and sometimes these foreclosure hearings can last a year

11  or more, and the statute is 18 U.S.C. 3664(d)(5) which says

12  within 90 days of sentencing we can establish the loss.

13           In this case I think the best thing to do,

14  Your Honor, would be to order the entire amount of the loans,

15  which is $1,638,957.10, which is the information I got from

16  TD Bank, and then when the property is actually sold we would

17  come back to the Court, either our office or the U.S.

18  Attorney's Office, and give Ms. Fletcher credit for whatever

19  the value of the property is against restitution, which would

20  then -- should net out to be what the correct amount is,

21  Your Honor.

22           THE COURT:  It's actually more fair to the defendant

23  that way, it's more accurate.

24           MR. WASCO:  It is more accurate, Your Honor.  It's

25  possible that it could end up being -- make it larger for her

1    or less, depending on what the house actually sells for.  We

2    don't know.  So at this point, you know, based on some initial

3    information, looks like it may go up, but at this point --

4              THE COURT:  So what is that amount for the TD,

5    1 million what?

6              MR. WASCO:  $1,638,957.10, Your Honor.

7              THE COURT:  All right.  Mr. LeLiever, do you follow

8    that?

9              MR. LELIEVER:  I follow that, Your Honor, and if --

10   again, bring to the Court's attention, we have a consent order

11   that the Court, I believe, has signed, and in paragraph 7 of

12   the consent order, the last sentence, the defendant will be

13   given the appropriate credit toward restitution at or after

14   sentencing, and we had anticipated that that might be the case,

15   and in approaching sentencing -- and I know this is completely

16   up to TD Bank with what they want to do with the property,

17   we've tried to get some offers from different people and tried

18   to send them to the Government to show them that this might be

19   what the value of the home is and these are some people that

20   might be interested.

21             Again, because of the process in North Carolina it's

22   going to take some time, but I believe with this consent order

23   that we've already entered into, this gives the Court the

24   ability to give my client credit once the property is sold and

25   it will be the actual amount.

1          For instance, the plea agreement believes that it

2    might be the tax value of the home, but the truth is the tax

3    value of the home might be giving her maybe 60,000 worth of

4    credit.  In the end we really don't know what the home is going

5    to sell for, so it might be more fair to both parties if we

6    just see what the home is actually sold for.

7          THE COURT:  Well, that was what he said.

8          MR. LELIEVER:  Right.  So I'm not in any disagreement

9    with -- I'm sorry, Your Honor.

10          THE COURT:  All right.  Any other objections to the

11    presentence report?

12          MR. HULBIG:  No other objections, Your Honor.

13          THE COURT:  Do you know of anything else that has to

14    go in the presentence report?

15          MR. WASCO:  No, Your Honor.  Thank you.

16          THE COURT:  Then I will be -- I'll start hearing your

17    arguments on sentence.  I'll begin by telling you I am familiar

18    with the defendant to the extent that her background and her

19    activities are set out in general in the presentence report.

20    I know that she's 55 years old, approximately, she did complete

21    through the 11th grade.  She obviously is an extremely

22    knowledgeable person in the world of numbers and banking and so

23    forth, regrettably some of it went the wrong way, but

24    nevertheless she has experience in those factors.

25          I know that she has three adult children.  I know

1   that she's divorced presently.  Her birth place is Durham,

2   North Carolina.

3          I did receive through your process, Mr. LeLiever,

4   letters testamentary from her son, Dylan Carden, from

5   Megan Reed, a friend, from her son Dusty Carden, from another

6   friend that works with North Carolina Department of Commerce,

7   Chris Farr, F-A-R-R, and from her business partner, Kim Weiss,

8   W-E-I-S-S, and from a friend, G.W. Pierce.  I've reviewed those

9   letters and know what they have to say about this person,

10  two of them being her children.

11         So I'll hear you on what I should do as far as

12  sentencing in this matter and why, Mr. LeLiever.

13         MR. LELIEVER:  Yes, Your Honor.  Thank you very much.

14         First I'd just like the Court to know G.W. Pierce is

15  in the courtroom and that's the letter that you received, and

16  my client has requested to say a few words to you.

17         THE COURT:  She'll get that after you get a chance.

18         Oh, she wants to talk to him?

19         MR. LELIEVER:  No, to the Court.

20         THE COURT:  I will hear her after I hear you.

21         MR. LELIEVER:  My client, of course, and there is no

22  motion or a memorandum filed in this case so we're not asking

23  for anything of that nature, we'd just be asking the Court to

24  sentence my client as to her 3553(a) factors, Your Honor, and

25  she's going to address how she believes that -- the seriousness

of the offense and how it's affected her. She obviously knows
and we've talked about the effect that it's had on all the
institutions and all the people that it happened with, that
she's affected, and if you look at the presentence report, it's
a very large number of people in businesses, in institutions
that she's affected very negatively, Your Honor, and we've
talked about that for some time and what that really means and
what she's showing her kids and how she's living her life.

I think the probation office did a great job in
providing the Court with a description of the home and how many
people lived there and the number of animals, the cats, I think
there was seven or eight cats and the dogs and all these
obligations. The kids don't have jobs, the other people aren't
really paying rent, it's all on my client, and she continues
this conduct to try and put up a facade for these other people,
and this has been a major problem for my client.

Not only has it been a major problem, but if you read
the mental health evaluations, she's been refusing mental
health treatment, or even when she goes in she refuses to
believe that she needs to go in further and further. She's
gone in -- the last time I think she went to three or four
appointments, not very many, and she's had traumatic
experiences in her life, she has a lot of responsibility on her
plate and she's let a lot of people down.

If you read the -- I know the Court has already read

1  the character letters.  There are a lot of people that depend

2  on her that she's letting down and she's very aware of what

3  that effect on those people is going to be.  It's going to be

4  not only what it is now, but what it's going to be.

5          We signed this consent order that basically said this

6  home that all these people live in is going to be given to the

7  Government to sell, because that's what needs to happen, but in

8  doing so it means that all these people are going to have to

9  find their own houses, all these other people are going to have

10  to do what they need to do.  My client is not going to be able

11  to sponsor that activity with her illegal activity anymore.

12          She understands what's gone on.  She understands how

13  terrible these acts have been, and she's asking the Court to

14  allow her two main things, one being she needs mental health

15  treatment.  She needs it badly.  She's trying to come to terms

16  with who she is, what's been happening, but if the Court can

17  see, this is not something that happened the first time that

18  she saw this indictment or when she saw the superseding

19  indictment or even entered into the plea.  It took her a long

20  time to come to terms with everything, more than just one thing

21  that she's doing.  She's doing a lot of things that are very

22  criminal, and she's come to accept that that's been the case.

23          When you take out a loan with TD Bank or Bank of

24  America, the evidence was overwhelming that that was -- that's

25  what it was, but the things of applying for a loan for your

1  business, disputing a credit -- she's come to terms with that.

2  Even that, as the Government stated, is a violation, is a crime

3  in itself, and this conduct that she's done repeatedly, not

4  even -- I'm only giving you a year long -- not even a year,

5  maybe a few months, this is something -- this scenario has gone

6  on for years and years and years, and at one point she told me,

7  you know, it's almost like I just forget about it. After it

8  happens, I try to block it out.

9         She needs treatment, Your Honor. She needs to

10  know -- she already knows what she's doing is wrong. The

11  problem is she doesn't know -- it's happened so long, she needs

12  help in trying to figure out who she is and how she's --

13         THE COURT: I understand your point on that. It's

14  well-taken.

15         MR. LELIEVER: The second thing is vocational

16  training, and that's very important for my client. She's been

17  running her own business for years, as the Court can see. She

18  cannot do that anymore. She needs some kind of stable

19  environment to be, she needs a craft, she needs some kind of

20  ability to work when she gets out there in the work force

21  working for others. She needs that ability. So she'd be

22  asking the Court to allow her to get vocational training.

23  She's a very smart woman, she can catch on very easily, and she

24  needs to be able to learn a trade, something of that nature.

25         She has obviously a lot of restitution. You saw in

```
 1    the PSR --

 2              THE COURT:  I intend to cover that.  I'm planning to

 3    require that during her term of supervised release after she's

 4    released from incarceration that she not be self-employed, and

 5    that will -- without Court permission or probation officer's

 6    permission, and that will take care of that, so that she's

 7    going to have to have a gainful job but not on her own.

 8              MR. LELIEVER:  I think that --

 9              THE COURT:  Go ahead now.  You're moving along slow.

10    Go ahead.  Anything else?

11              MR. LELIEVER:  And I believe my client wants to

12    speak.

13              THE COURT:  I'm going to hear from her.

14              Thank you, Mr. LeLiever.  You've represented your

15    client very professionally during the hearings I've had with

16    you and I appreciate that and I know she does.

17              Ms. Fletcher, I'll be glad to hear you, ma'am.

18              THE DEFENDANT:  Yes, sir.  First I want to say that I

19    am very ashamed and I have caused a lot of damage and things to

20    people and to my family and I am very sorry.  I just was trying

21    to do it all and, you know, I guess I just got to a point to

22    where I just took the easier route out and I shouldn't have

23    done that.

24              I spent the last 48 days in jail dealing with my

25    conscience and realizing what I had done wrong and accepting
```

what I had done wrong, knowing that I would never, regardless
of whatever taps on my shoulder tells me to do, ever do
anything like that again.  I feel so bad that I can't be there
for a 18-year-old son to help him go to college and get a
better life and support him, and I feel awful for anyone that I
have hurt.  I just want the ability to make it right, and know
that this is -- this isn't me, this is -- I'm a good person and
I just want to show that to the Court, get a job, be
responsible and take care of my obligation and pay people back
that I owe.

I just am truly sorry and I just -- I think when the
Medicaid business -- it helped me help people, and I have
helped a lot of people, but I'm just horrible with money, and I
want to keep helping people, because I feel like that if we
don't help people, what have we done.  I think dealing with my
own conscience and dealing with God and realizing I have just
messed up so bad, I again am truly sorry, and I'm sorry to my
family because I love them so much.

THE COURT:  All right.  You're doing okay, ma'am.
Anything else you want to tell me today?

MR. LELIEVER:  No, Your Honor.

THE COURT:  All right.  Thank you.  You may be
seated.

Mr. Hulbig, what says the United States in this case?

MR. HULBIG:  Thank you, Your Honor.

As defense counsel alluded, the PSR in this case is a
very complete recitation about the offense conduct and the
relevant conduct in the case, Your Honor, so I don't want to
revisit what Your Honor has already read carefully through.
I just want to emphasize three critical points that I think
should guide the Court's decision as to sentencing.

The first is with respect to the offense conduct, the
scope, sophistication and the complexity of this conduct.
We're talking about just with the charges she pled guilty to,
three different businesses from three different states over a
short ten month span, and we're talking close to 200,000 in
loss just for that alone.

Number 2 is this defendant has an incredibly long and
sordid history of financial fraud and misdealings such that
even in our position at the Economic Crime Unit we don't see
very often. She stands apart from many other individuals who
have come before the Court. She has a slew of worthless check
convictions and arrests that date back to 1992. She's amassed
over $1.4 million in civil judgments that date back to 1990,
there's been more than 80 civil collection cases, and I think
what stands out in that history, the history that she had
before she got here was just the range, Your Honor, of the
victims that this defendant has hurt. We're talking mom and
pop businesses all the way to gigantic banks like Wells Fargo.
She was unphased, undeterred, and just kept proceeding with no

1    concern for who it was she was defrauding.

2            She says, Your Honor, to you now she wants to help

3    others.  We think that's a noble goal and we hope that that's

4    something she can pursue, but the record that has come before

5    the Court today, Your Honor, does not establish that that is

6    the case.  She accumulates assets and then she walks away, and

7    she accumulates those assets by whatever means necessary.

8            The third and final thing that I think should guide

9    Your Honor's decision with regard to sentencing is the

10   defendant's post-arraignment conduct.  I think, again, the

11   amount of resources that were consumed by the United States

12   Attorney's Office, the Secret Service just dealing with

13   Ms. Fletcher during this fairly short window of supervision,

14   she didn't -- you know, when she came in and she pled guilty,

15   there was an expectation under the terms of the plea, with the

16   Court, with the Government, that she was going to continue to

17   abide by her obligations and leave the life of crime behind,

18   but instead she continued to carve out this very same path and,

19   you know, there would be mornings I would come in, I'd get a

20   voice mail from SECU or from VW Credit saying, who is this

21   woman, what's this about, we have a letter in our hands from

22   one of our employees but our employee didn't authorize that

23   letter to be sent, and this is during the period of

24   supervision.

25           It's just a categorical refusal to accept

1    responsibility, Your Honor.

2            So under the 3553(a) factors, obviously, I think the

3    two major factors here that deserve the heaviest weight are the

4    need for deterrence, specific deterrence, and also the need to

5    protect the public from further crimes by this defendant.  It's

6    clear that she needs to be incarcerated, Your Honor, and face a

7    serious enough jail term that she will -- that message will be

8    sent and that message will be received by her so that when she

9    does get released at some point that she is able to carry out

10   the life that she has articulated that she'd like to lead for

11   herself.

12           One other thing I wanted to say just with respect to

13   the victims, Your Honor.  This notion, again, that -- I know

14   a lot of times in a bank fraud case we're talking about the

15   TD Bank, the Wells Fargo, the JP Morgans of the world, but

16   these were real -- there are real victims in this case.  They

17   may not be here in the courtroom, but these are individuals

18   whose identities she unlawfully used, SECU employees, the

19   NewBridge Bank employees, and these are individuals who were

20   just trying to sell their house, a very stressful transaction

21   for sure for everyone.  Any sellers, when they would get --

22   when Ms. Fletcher would show up at their door with an offer for

23   their house, little did they know what it was that -- who it

24   was that they were about to start dealing with.

25           In going through the discovery in preparation for

1   today's sentencing, Your Honor, I happened upon a letter that
2   was included with what Special Agent Turner had provided to the
3   Government at the initial referral of the case, and it's from
4   one of these -- one the sellers who had been completely burned
5   by the defendant, and she wrote a long letter to the case agent
6   which if Your Honor -- with Your Honor's permission, I would
7   tender it to the Court and may read just one very small
8   paragraph, because I think this victim, although she's not
9   here, I think she says it better than I could ever say it.
10           THE COURT:  Go ahead.
11           MR. HULBIG:  Thank you, Your Honor.
12           Your Honor, the victim in this case is Dori Witek.
13  Ms. Witek owned a large property out in the Chapel Hill area,
14  she had been selling the property in January, 2011 for
15  2.2 million, a very expensive property, and Ms. Fletcher
16  approached this seller to try and buy the property, and it went
17  south, very south for this person, and she describes in great
18  detail the spiraling trend of the deal and how she was hurt by
19  it.
20           At the end she says -- she concludes:  In retrospect,
21  Teresa was a fraud, a con artist of the worst, most cunning
22  kind.  We fell for it and that's embarrassing, and it cost us
23  a lot of time, money and anguish.  We were victims, as were so
24  many others, and this woman is most definitely a menace to
25  others.  Please keep me informed of your progress in this

investigation and let me know how we can help you stop this
criminal and put her behind bars where she is no longer a
threat as she pays for the crime she has committed against
innocent and trusting people as well as an amazing number of
banks and businesses, including car dealerships, architects,
design studios, electronics stores, antique dealers, private
school, photographers, publishing companies, newspapers,
builders, realtors and many more.

Again, I think Ms. Witek puts in stark -- in stark
light who this defendant is as she comes before the Court.

So in light of the seriousness of the offense
conduct, the defendant's history and characteristics, the need
for deterrence, Your Honor, we recommend a sentence at the very
top of the guideline range in this case.  We think that that
sentence is sufficient but not greater than necessary to comply
with the purposes of sentencing, and we would also ask for the
maximum supervised release term of five years.  This is someone
who will need the careful and attentive monitoring of the
United States Probation Office for the full period that's
allowed by the bank fraud statute.

We also ask that as part of the supervised release
term that she continue not to be able to apply for new credit,
for new bank accounts, for any financial products without the
permission of the United States Probation Office.  That was a
provision that I talked with Probation about at the time of her

1    initial appearance, because the Government had significant

2    concerns about the risk that she would be back doing the same

3    thing, and unfortunately that risk turned out to come to pass,

4    so we would just want that to be included, Your Honor, in any

5    supervised release order.

6            Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Hulbig.

8            I've made up my mind.  You may stand.

9            The Court adopts the findings in the presentence

10   report as credible and reliable and based upon those findings

11   I've calculated the imprisonment range prescribed by the

12   advisory guidelines and I've considered that range as well as

13   the factors set out in 18 U.S. Code Section 3553(a).

14           Now, pursuant to the Sentencing Reform Act of 1984

15   and in accord with the Supreme Court decision in United States

16   v. Booker, it is the judgment of the Court that the defendant,

17   Teresa Lyn Fletcher, is hereby committed to the custody of the

18   United States Bureau of Prisons to be imprisoned for a term of

19   60 months on each count to be served concurrently for a total

20   of 60 months.

21           Upon your release you'll be placed on supervised

22   release for a term of five years.  This term consists of

23   five years on each of the three counts -- strike that.  It's

24   five years on Counts 1 and 2 and three years on Count 3, all to

25   run concurrently.  Within 72 hours of release you'll report in

person to the probation office in the district to which you're
released, and while on release you shall not commit another
Federal, State or local crime, shall not possess a controlled
substance, a firearm or destructive device, and you'll comply
with the standard and the following additional conditions:
One, you shall participate in a program of mental health
treatment as directed by your probation officer; second, you'll
consent to a warrantless search by a U.S. probation officer or
at his request any law enforcement officer of your person and
premises, including any vehicle; and third, you'll cooperate in
the collection of DNA. Fourth, you shall not be self-employed
during the period of your supervision.

         The Court believes that you are not a likely suspect
for abuse of drugs or alcohol and therefore no restriction is
imposed thereon. The Court recommends that you be exposed to
the most intense mental and/or psychological treatment during
the term of your incarceration. It is further ordered that you
shall pay to the United States the special assessment of $300
which is due and payable immediately.

         It is ordered that you make restitution to the
following victims in the following amounts: First victim, Bank
of North Carolina, whose address is in the presentence report,
in the amount of $10,000. Second one, TD Bank, whose address
is in the presentence report in the amount of $1,638,957, and
to be credited thereafter with the sale proceeds. Third and

finally, Liberty Mutual Insurance in the amount of $53,641.
Any payment made, if not payment in full, shall be divided
proportionately among the victims.  The Court finds that you're
without the ability to pay interest and so interest is
therefore waived.

The Court finds that you do not have the ability to
pay a fine in addition to Court-imposed restitution, therefore
no fine is being imposed.  Payment of restitution is due and
payable immediately; however, if you're unable to pay, the
special assessment and restitution may be paid through the
inmate financial responsibility program at the rate of $25 per
quarter during your incarceration.  The Court has considered
your financial resources and ability to pay, and any balance
owed at the time of your release shall be remitted in the
amount of $100 per month to begin 60 days after your release.
Your probation officer shall take into consideration your
ability to pay and notify the Court of any modifications needed
after your release.

That concludes the statement of the sentence in her
case.

Mr. United States Probation Officer, do you know of
any required changes to further comply with U.S. sentencing
laws?

MR. WASCO:  No, Your Honor.  Thank you.

THE COURT:  Mr. LeLiever, do you have any remaining

1  legal objections to the sentence as stated by the Court?

2              MR. LELIEVER:  No, Your Honor.

3              THE COURT:  United States, do you have any?

4              MR. HULBIG:  We have no objections, Your Honor.

5              THE COURT:  Teresa Lyn Fletcher, by virtue of the

6  authority duly invested in me, I hereby impose upon you the

7  sentence that I have just stated.

8              Now, I am also required to tell you that if you

9  believe your underlying guilty plea was somehow involuntary or

10 if there was some other fundamental defect in the proceeding,

11 you may have a right to appeal.  If you believe the sentence

12 that I have just imposed upon you is contrary to law, you may

13 have a right to appeal.  In any extent, if there is a basis for

14 appeal, you must file your notice with the Clerk of this Court

15 within 14 days of today.  I ask Mr. LeLiever to assist you and

16 confer with you and if there is a basis and you desire to

17 exercise that basis, to assist you in getting the notice filed,

18 and after that it would be up to the Circuit Court to ascertain

19 whom your appellate attorney would be.

20             Are there any other matters, Mr. LeLiever?

21             MR. LELIEVER:  Not at this time, Your Honor.

22 Thank you very much.

23             THE COURT:  From the United States?

24             MR. HULBIG:  Nothing further, Your Honor.  Thank you.

25             THE COURT:  That concludes this hearing.  I'll remand

1   the defendant to the custody of the United States Marshal, and

2   good luck.

3                        - - - - -

4              (Proceedings concluded at 1:18 p.m.)

5                        - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3          This is to certify that the foregoing transcript of

 4   proceedings taken in a motion hearing and sentencing hearing in

 5   the United States District Court is a true and accurate

 6   transcript of the proceedings taken by me in machine shorthand

 7   and transcribed by computer under my supervision, this the 22nd

 8   day of June, 2015.

 9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```